**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

JOHN JAMES BERWANGER,

        Plaintiff,

vs.

KRISTOFER KABERG, et al.,[1]

        Defendant.

No. 21-CV-98-CJW-KEM

**MEMORANDUM OPINION
AND ORDER**

---

**TABLE OF CONTENTS**

I.     INTRODUCTION .......................................................................... 3

II.    RELEVANT BACKGROUND ........................................................ 3

    A.    The Injury and Care in Jail ...................................................... 3

    B.    Care at the Iowa Medical Classification Center .............................. 3

    C.    Care at the Anamosa State Penitentiary ....................................... 4

    D.    Care by the UIHC Orthopedics Department ................................... 7

    E.    The Grievance Process ........................................................... 8

---

[1] The parties' caption noted the defendants as Vicki Knowles, et al. The Court has changed the caption to reflect the identity of the remaining defendants. Vickie Knowles was terminated as a defendant in this case on February 13, 2023, after defendants filed their motion for summary judgment. (Doc. 77). The Court notes that defendant Joseph Kennedy was dismissed previously on August 3, 2022. (Doc. 53). The Court further notes that plaintiff's complaint misspells defendant Kaberg's first name; the Court here has used the correct spelling.

1.     Grievance 48092 .......................................................... 8

2.     Grievance 48362 .......................................................... 9

3.     Grievance 49888 ..........................................................10

4.     Grievance 51727 ..........................................................11

F.     Plaintiff's Complaint and Procedural History .................................11

III.     APPLICABLE LAW ....................................................................12

A.     Summary Judgment ................................................................12

B.     Section 1983 Claims ................................................................14

C.     Deliberate Indifference to a Serious Medical Need ..........................15

D.     Prisoner Litigation Reform Act..................................................16

IV.     ANALYSIS.............................................................................17

A.     Failure to Exhaust Administrative Remedies .................................17

B.     Deliberate Indifference to a Serious Medical Need ..........................19

C.     Claims for Monetary Relief Under 42 U.S.C. 1997e(e) ....................24

D.     Claims Against Defendant Barner and Krugle ...............................25

E.     Qualified Immunity ................................................................26

V.     CONCLUSION.........................................................................29

# I.     INTRODUCTION

This matter is before the Court on a motion for summary judgment filed by defendants Warden Kristofer Kaberg, Dr. Michael Dehner, and nurses Laura Barner, Sally Potter, Barbara Devaney, Laura Krugle, and Erin Sargent, on January 13, 2023. (Doc. 73).  Plaintiff filed a timely resistance.  (Doc. 81).  Defendants filed a timely reply (Doc. 86) and a timely response to plaintiff's statement of additional facts (Doc. 89).  For the following reasons, the Court **grants** defendants' motion.

# II.     RELEVANT BACKGROUND

## A.     *The Injury and Care in Jail*

Plaintiff asserts that on December 6, 2019, he suffered an injury to his right shoulder when he was handcuffed and transported to the Dubuque County Jail (the "jail"). (Docs. 25, at 3; 81-1, at 1).  Plaintiff claims that he reported this injury to jail personnel immediately.  (Docs. 25, at 4; 81-1, at 2).  Plaintiff submitted numerous requests for medical treatment and was seen by Advanced Correctional Healthcare ("ACH") medical staff multiple times while at the jail.  (*See* Docs. 37-2; 46-1).  Dubuque County contracted with ACH to provide medical care at the jail; the ACH medical staff were not employees of Dubuque County or the jail.  (Docs. 37-2 at 1-2; 46-1, at 2 & 4).  Plaintiff received over-the-counter medication and ice for his shoulder while at the jail.  (Doc. 81-1, at 2).

## B.     *Care at the Iowa Medical Classification Center*

On March 20, 2020, plaintiff was transferred to the Iowa Department of Corrections to begin serving a 25-year sentence for Sex Abuse in the Second Degree with a Child Under 12—Life Special Sentence.  (Doc. 73-2, at 1).[2]  When plaintiff first came

---

[2] When a party has admitted a fact in an opposing party's statement of undisputed facts, the Court will simply cite the applicable page of the statement of undisputed facts for ease of reference instead of the underlying documents in the appendix supporting that statement of fact. When, however, a fact is in dispute, the Court will rely on and cite the applicable document from the parties' appendices.

into the Iowa Department of Corrections, he was incarcerated at the Iowa Medical and Classification Center in Oakdale, Iowa ("IMCC"). (*Id.*). Upon his arrival at the IMCC, medical staff evaluated plaintiff. (*Id.*, at 2). Plaintiff's intake evaluation referenced a history of long-term joint pain and right shoulder numbness, but did not identify a complaint of acute joint pain or injury. (*Id.*; Doc. 81-1, at 2).

On March 25, 2020, staff provided plaintiff with Tylenol at his request when he complained of pain in a number of areas, including his right shoulder. (Doc. 81-1, at 2). On March 28, 2020, staff supplemented plaintiff's pain medication to include Ibuprofen. (*Id.*). On April 8, 2020, plaintiff requests ice packs to address pain in his shoulder and back. (Doc. 74, at 16).

On April 9, 2020, a physician's assistant at the IMCC examined plaintiff in response to complaints of chronic back pain which plaintiff stated started in 2015 after he "moved a dresser" and to injuries he suffered when he was 9 and 10 years old. (Doc. 73-2, at 2-3). During this examination, plaintiff also complained of pain in his right rotator cuff that began when he was taken into custody in Dubuque in December 2019. (*Id.*, at 3). The examination included bilateral shoulder exam which identified that plaintiff had symmetric 5 out of 5 strength and full range of motion in both shoulders. (*Id.*). The examination did not identify any shoulder abnormalities. (*Id.*). Plaintiff was provided conservative therapy with medication and instructed to return to the clinic for follow up care as needed. (*Id.*).

### C.    *Care at the Anamosa State Penitentiary*

On April 17, 2020, plaintiff was transferred to the Anamosa State Penitentiary in Anamosa, Iowa (the "penitentiary"). (*Id.*). Defendant Kristofer Karberg became the Warden of the penitentiary on June 11, 2021, approximately 14 months after plaintiff first arrived there. (*Id.*, at 1-2). Prior to that appointment, defendant had not worked for the Iowa Department of Corrections. (*Id.*, at 2). Defendant Dr. Michael Dehner was

a medical doctor who works at the penitentiary. (*Id.*). Defendants Laura Barner, Sally Potter, Barbara Devaney, Laura Krugle and Erin Sargent were all nurses who worked at the penitentiary. (*Id.*).

Plaintiff's medical file, that accompanied him to the penitentiary, showed that he had several major health problems, including: low back pain, shoulder pain, hypothyroidism, adjustment disorder with anxiety, pedophilic disorder, and dental caries (i.e., tooth decay) with partial loss of teeth. (*Id.*, at 3; Doc. 74, at 3).

On April 30, 2020, plaintiff sent a "kite" to medical staff indicating that he was experiencing "extreme pain in my back and shoulder." (Doc. 74, at 28).

On May 1, 2020, plaintiff was seen by Suzanne Gansen, a penitentiary nurse, due to a report of chronic back pain from a prior injury and shoulder pain from plaintiff's December 2019 incident in Dubuque. (Docs. 73-2, at 3; 74, at 29). Plaintiff stated that he experienced "pins and needles and some numbness" in his hips and legs from his back injury. (Doc. 74, at 29). Plaintiff's vital signs were found to be within normal limits and a physical examination revealed no shoulder abnormalities and showed he had a full range of motion. (Doc. 73-2, at 3-4). Plaintiff was scheduled for a non-emergent appointment to see the onsite physician. (*Id.*, at 4).

On May 5, 2020, Dr. Dehner saw and assessed plaintiff. (*Id.*). During this encounter, plaintiff complained of his back pain, neck pain, and right shoulder pain. (*Id.*). Plaintiff said it hurt to raise and lower his right shoulder and that it "click[ed] and grind[ed]" with movement. (Doc. 74, at 31). Dr. Dehner's physical examination of plaintiff revealed no deformity and a full range of motion in both shoulders, but noted pain and tenderness in the right shoulder and muscle spasms in the neck. (Docs. 73-2, at 4; 74, at 31-32). Dr. Dehner prescribed conservative therapy, including medication, and ordered X-rays of plaintiff's shoulders and C-spine. (Doc. 73-2, at 4). The X-rays did not reveal any acute abnormalities. (*Id.*). Dr. Dehner had experience treating rotator

5

cuff tears, symptoms of which may include pain and tenderness with range of motion and decreased strength, and muscle spasms in the neck. (Doc. 81-1, at 5).

On June 9, 2020, plaintiff was seen again by medical staff. (Doc. 73-2, at 4; Doc. 74, at 43-44). Plaintiff complained of right shoulder pain and back pain, especially connected with his work mopping. (Docs. 73-2, at 4; 74, at 43). Nurse Amy Shipley conducted a physical examination and found plaintiff's right shoulder did not have any deformities, had a full range of motion, and was not tender to palpation. (Doc. 73-2, at 4). She made an appointment for further evaluation by Dr. Dehner. (*Id.*).

On June 11, 2020, Dr. Dehner saw plaintiff again. (Doc. 73-2, at 5). Plaintiff complained of right shoulder pain with movement. (Doc. 74, at 45). Dr. Dehner again reviewed plaintiff's X-rays, which again showed no shoulder abnormalities. (Doc. 73-2, at 5). A physical examination of plaintiff showed no change from the prior physical examination. (*Id.*). Dr. Dehner prescribed continued conservative treatment, involving band therapy and a change in plaintiff's medication, and also indicated he would make an Orthopedic Referral to the University of Iowa Hospital and Clinics ("UIHC"). (*Id.*). Dr. Dehner made that referral on June 19, 2020. (Doc. 74, at 47).

On August 10, 2020, Dr. Dehner saw plaintiff again on the primary complaint of back pain. (Doc. 73-2, at 5). Plaintiff reported that he was not taking prescribed anti-inflammatory medication because of concerns about side effects. (*Id.*). Dr. Dehner started plaintiff on acetaminophen then. (*Id.*).

On October 15, 2020, Dr. Dehner saw plaintiff again for a follow up on "lower back and neck pain." (*Id.*). Plaintiff's vital signs were stable and a physical examination of the thoracic spine noted full range of motion and no spinal tenderness. (*Id.*). Plaintiff reported muscle spasms, but did not report shoulder pain during this encounter. (*Id.*). Dr. Dehner prescribed muscle relaxer medication for muscle spasms as well as a temporary work restriction. (*Id.*).

On November 10, 2020, plaintiff tested positive for COVID-19 and was seen by healthcare staff until he recovered ten days later. (*Id.*, at 6).

On December 16, 2020, Dr. Dehner saw plaintiff again, this time for a diagnosis of an ear infection and ingrown toe nail. (*Id.*). The doctor treated those conditions. (*Id.*). Plaintiff did not report shoulder pain or discomfort during this visit. (*Id.*).

### D. Care by the UIHC Orthopedics Department

On December 31, 2020, plaintiff was seen at the UIHC on the June 2020 referral about plaintiff's right shoulder pain. (*Id.*, at 6-7). Between Dr. Dehner's June 2020 referral for an orthopedic evaluation and plaintiff's appointment on December 31, 2020, there were more than 800 documented cases of COVID-19 at the penitentiary and transportation for outpatient specialty appointments was limited as many of the UIHC's referral services were unable to accommodate non-urgent and non-emergent referrals out of an effort to limit the spread of the virus. (Doc. 73-3, at 12).[3]

At his orthopedic appointment, plaintiff complained of right shoulder discomfort and "popping sensation which causes some numbness" in his right arm and fingers. (Doc. 74, at 96). The staff ordered plain radiographs of the right shoulder and they were found to be normal with "no fracture or major arthritis." (Doc. 73-2, at 7). UIHC orthopedics staff discussed with plaintiff two options: the first was continued conservative therapy and the second was to proceed with an MRI. (*Id.*). Plaintiff chose the MRI option, which was performed that same day. (*Id.*).

---

[3] Plaintiff denies these facts, but only "for lack of information." Such a denial is insufficient to generate a genuine issue of material fact. *See* Local Rule 56(b) ("The failure to respond to an individual statement of material fact, with appropriate appendix citations, may constitute an admission of that fact.");*see also United States v. Klimek*, No. 4:14–cv–00480, 2016 WL 7494271, at *1 n.1 (S.D. Iowa July 7, 2016) (accepting alleged facts as true when party opposing motion for summary judgment simply denied the fact for lack of information).

On February 22, 2021, plaintiff was seen again at the UIHC orthopedics department as a follow up to the MRI. (*Id.*). The staff told plaintiff that the MRI showed a labral tear of the anterior inferior labrum. (*Id.*). UIHC orthopedics presented plaintiff again with two options: the first was continued nonoperative therapy and the second was surgery. (*Id.*). Plaintiff chose surgery. (*Id.*).

On February 25, 2021, Dr. Dehner reviewed the UIHC orthopedic department's recommendations and scheduled plaintiff for surgery. (*Id.*).

On May 5, 2021, plaintiff was seen by UIHC orthopedics for a preoperative evaluation. (*Id.*, at 8).

On May 19, 2021, the UIHC orthopedics performed an arthroscopy of plaintiff's right shoulder labrum. (*Id.*).

On June 29, 2021, plaintiff presented at the UIHC orthopedics department for a post-surgery evaluation and was found to be doing well overall; a plan was discussed for continued range of motion and physical therapy. (*Id.*).

### E.    *The Grievance Process*

The penitentiary had a grievance process whereby plaintiff was able to grieve issues raised in his federal law suit. (*Id.*, at 13). Plaintiff filed four grievances related to his health care while in custody at the penitentiary pertinent here.

### 1.    *Grievance 48092*

On December 30, 2020, plaintiff wrote a grievance concerning right shoulder pain wherein he stated, among other things, "They aren't sure if my appointment was push (sic) back due to Covid 19." (*Id.*, at 10).

On December 31, 2020, Grievance Officer Cindy Wolmutt received the grievance, assigned it number 48092, and sent it back to plaintiff advising him that the grievance was not processed because he had not attempted informal resolution prior to filing the grievance. (*Id.*).

8

On March 3, 2021, plaintiff filed an Appeal of the December 31, 2020 determination that he had not attempted informal resolution. (*Id.*).

On March 15, 2021, Deputy Warden Scott Eschen denied the Appeal and reiterated that plaintiff had not followed proper procedure. (*Id.*).

On March 15, 2021, plaintiff appealed the denial to Central Office. (*Id.*).

On March 25, 2021, Assistant Deputy Director Robin Bagby denied the appeal. (*Id.*).

## 2. *Grievance 48362*

On January 24, 2021, plaintiff wrote a grievance concerning his claim that a Dubuque Sheriff damaged his right shoulder and used excessive force on him after his criminal trial. (*Id.*).

On February 5, 2021, Grievance Officer Cindy Wolmutt received the grievance, assigned it number 48362, and sent it back to plaintiff advising him that the grievance was Non-Grievable because the grievance concerned a matter that he needed to resolve with Dubuque County. (*Id.*, at 11).

On March 3, 2021, plaintiff filed an Appeal of the February 5, 2021 determination that the grievance was Non-Grievable. (*Id.*).

On March 15, 2021, Deputy Warden Scott Eschen denied the Appeal stating:

> "I have reviewed your grievance in which you allege you have pain that initiated in Dubuque County, and in which you request as a resolutio[n] to help you resolve the pain issue. It appears that at least part of your grievance relates to your experience in Dubuque county, and this fall (sic) outside of the ASP grievance policy. I also find in reviewing your KIOSK's that ASP medical staff have responded to your concerns of pain by scheduling appropriate appointments. As such I cannot uphold your grievance since it is apparent that our medical staf[f] is making every effort to address your pain issue."

(*Id.*).

On March 18, 2021, plaintiff appealed the denial to Central Office. (*Id.*).

On March 25, 2021, Assistant Deputy Director Robin Bagby denied the appeal. (*Id.*).

### 3. *Grievance 49888*

On April 27, 2021, plaintiff wrote a grievance that read as follows:

> 4-14-21 I messg (NSD) Laura Barner about my on going pain in R-shoulder + L-Shoulder neck + multiple points in my Back along with Both hips and left knee, med staff has only adressed [sic] R-shoulder issue and nothing els[e][.] I have not got a Respons[e] Back from (NSD) and I['] m in Pain every Day."

(Doc. 73-3, at 36).

On May 6, 2021, Grievance Officer Cindy Wolmutt received the grievance, assigned it number 49888, and sent the grievance Acknowledgment and Receipt back to plaintiff, advising him that the grievance would be processed as a standard grievance and not an emergency grievance as the grievance did not meet the definition of emergency as defined in the Grievance Policy. (*Id.*, at 11-12).

On May 27, 2021, Grievance Officer Cindy Wolmutt partially sustained the grievance, stating, "I have been informed you have an appointment scheduled at UIHC. If you are having issues before you go to that appointment, you should follow Ms. Barner's instructions and send a kiosk message to medical sick call." (*Id.*, at 12).

On June 7, 2021, plaintiff filed an Appeal of Grievance Officer Cindy Wolmutt's May 27, 2021 decision. (*Id.*).

On June 25, 2021, Associate Warden of Treatment Tracy Dietsch partially sustained the Appeal. (*Id.*).

On June 26, 2021, plaintiff appealed the response to Central Office. (*Id.*).

On August 6, 2021, Executive Officer Rebecca Bowker partially sustained the appeal. (*Id.*).

### 4. Grievance 51727

On August 30, 2021, plaintiff wrote a grievance concerning on going pain. (*Id.*).

On September 8, 2021, Grievance Officer Cindy Wolmutt received the grievance, assigned it number 51727, and sent the Grievance Acknowledgment and Receipt back to plaintiff, advising him that the grievance would be processed as a standard grievance and not an emergency grievance as the grievance did not meet the definition of emergency as defined in the Grievance Policy. (*Id.*, at 12-13).

On September 29, 2021, Grievance Officer Cindy Wolmutt partially sustained the Grievance stating among other things, "It appears you are not following their directives and you are not taking the medication prescribed for pain. I suggest you kiosk medical sick call as you have been directed and discuss your concerns with them so your issues can be monitored. I also suggest you follow their treatment plans." (*Id.*, at 13).

On October 4, 2021, plaintiff filed an Appeal of Grievance Officer Cindy Wolmutt's September 29, 2021 decision. (*Id.*).

On November 18, 2021, Associate Warden of Treatment Tracy Dietsch denied the Appeal. (*Id.*).

On November 21, 2021, plaintiff appealed the response to Central Office. (*Id.*).

On November 29, 2021, Executive Officer Rebecca Bowker denied the appeal. (*Id.*).

### F. Plaintiff's Complaint and Procedural History

On October 15, 2021, plaintiff filed his original Complaint. (Doc. 1).[4] Plaintiff asserted a claim under Title 42, United States Code, Section 1983, alleging that all the

---

[4] Plaintiff has since filed two amended complaints, the latest and operative one filed at docket 25.

defendants were deliberately indifferent to a serious medical need in violation of the Eighth Amendment. (*Id.*).

On August 3, 2022, the Court granted Sheriff Kennedy's motion for summary judgment. (Doc. 53).

On February 13, 2023, the Court granted a motion for summary judgment filed by the ACH nurses, defendants Vickie Knowles, Katie Harris, and Lisa Tyler. (Doc. 77). The remaining defendants here are all connected with the penitentiary.

### III.   APPLICABLE LAW

#### A.   Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When asserting that a fact is undisputed or is genuinely disputed, a party must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Alternatively, a party may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). More specifically, a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "An issue of material fact is genuine if it has a real basis in the record," *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted), or "when a reasonable jury could return a verdict for the nonmoving party on the question," *Wood v. DaimlerChrysler Corp.*, 409 F.3d

12

984, 990 (8th Cir. 2005) (internal quotation marks and citation omitted). Evidence that presents only "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50 (citations omitted), does not make an issue of fact genuine. In sum, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" that it requires "a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 249 (citation and internal quotation marks omitted).

The party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citation omitted). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or other evidence designate specific facts showing that there is a genuine issue for trial. *See Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005).

In determining whether a genuine issue of material fact exists, courts must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that can be drawn from the facts. *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (citation omitted); *Matsushita*, 475 U.S. at 587–88 (citation omitted); *see also Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009) (stating that in ruling on a motion for summary judgment, a court must view the facts "in a light most favorable to the non-moving party—as long as those facts are not so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them") (alteration in original) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). At this stage, a court does "not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004) (citation

omitted).  "Rather, [a] court's function is to determine whether a dispute about a material fact is genuine[.]"  *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996).  When considering a motion for summary judgment, the court "need consider only the cited materials, but it may consider other materials in the record."  FED. R. CIV. P. 56(c)(3).

### B.    *Section 1983 Claims*

Title 42, United States Code, Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . .  subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

Section 1983 was designed to provide a "broad remedy for violations of federally protected civil rights."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 685 (1978).  Section 1983, however, provides no substantive rights.  *See Albright v. Oliver*, 510 U.S. 266, 271 (1994); *Graham v. Connor*, 490 U.S. 386, 393-94 (1989); *Chapman v. Hous. Welfare Rghts. Org.*, 441 U.S. 600, 617 (1979).  "One cannot go into court and claim a 'violation of [Section] 1983'—for [Section] 1983 by itself does not protect anyone against anything."  *Chapman*, 441 U.S. at 617.  Rather, Section 1983 provides a remedy for violations of all "rights, privileges, or immunities secured by the Constitution and laws [of the United States]."  42 U.S.C. § 1983; *see also Albright*, 510 U.S. at 271 (Section 1983 "merely provides 'a method for vindicating federal rights elsewhere conferred.'" (citation omitted)); *Graham*, 490 U.S. at 393-94 (same); *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980) (finding that "Constitution and laws" means Section 1983 provides remedies for violations of rights created by federal statute, as well as those created by the Constitution).  To state a claim under Section 1983, a plaintiff must establish: (1) the

14

violation of a right secured by the Constitution or laws of the United States and (2) the alleged deprivation of that right was committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

### C. Deliberate Indifference to a Serious Medical Need

"The Eighth Amendment requires that inmates be provided with adequate medical care. To establish that a denial of medical care rises to the level of an Eighth Amendment violation, an inmate must show that a defendant acted with deliberate indifference." *Barr v. Pearson*, 909 F.3d 919, 921 (8th Cir. 2018) (internal citation omitted). The deliberate indifference standard includes an objective prong and a subjective prong. *Barton v. Taber*, 820 F.3d 958, 964 (8th Cir. 2016). The objective prong requires that the complaint plead facts showing the plaintiff suffered from an objectively serious medical need. *Id.* "To be objectively serious, a medical need must have been 'diagnosed by a physician as requiring treatment' or must be 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" *Id.* (quoting *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014)). The subjective prong requires that the defendant knew the plaintiff needed medical care yet disregarded a known risk to the plaintiff's health. *Id.* at 965.

As a general matter, "[t]he Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish." *Jenkins v. Cnty. of Hennepin*, 557 F.3d 628, 633 (8th Cir. 2009). For a delay in receiving medical treatment to violate a prisoner's constitutional rights, the prisoner must plead facts showing the delay had a harmful effect on the medical condition at issue. *Dulany v. Carnahan*, 132 F.3d 1234, 1243 (8th Cir. 1997) (holding a prisoner must show defendants "ignored an acute or escalating condition" or the delay "adversely affected the prognosis"). When medical care is provided to a prisoner, malpractice in that care is not sufficient to violate the prisoner's Eighth Amendment rights. *Barr*, 909 F.3d at 921. And although "inmates

15

have a right to adequate medical care, they have no 'right to receive a particular or requested course of treatment,'" and thus a prisoner's disagreement with a medical professional's opinions regarding the course of treatment does not violate the prisoner's constitutional rights. *Id.* at 921–22 (quoting *Dulany*, 123 F.3d at 1239).

To establish an official's deliberate indifference to a serious medical need, a plaintiff must demonstrate: "(1) a substantial risk of serious harm to the inmate existed and (2) the prison official knew of and disregarded that risk." *Robinson v. Hager*, 292 F.3d 560, 563-64 (8th Cir. 2002) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)); *see also Morris v. Cradduck*, 954 F.3d 1055, 1058 (8th Cir. 2020). As noted, to establish such a violation, plaintiff must demonstrate both an objective and subjective component. *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997). An imperative prerequisite to success on this claim is that the officials "knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). This showing requires a "mental state akin to criminal recklessness: disregarding a known risk to the inmate's health." *Gordon ex rel. Gordon v. Frank,* 454 F.3d 858, 862 (8th Cir. 2006) (citation omitted). The result of that requirement is the necessary implication that negligent failure to diagnose and negligent treatment are insufficient to support a claim under the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976); *Bellecourt v. United States*, 994 F.2d 427, 431 (8th Cir. 1993); *see also Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 755 (5th Cir. 2001) ("It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference.").

### D. *Prisoner Litigation Reform Act*

Title 42, United States Code, Section 1997e(a) of the Prisoner Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner

confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." A court cannot excuse a prisoner plaintiff's failure to exhaust administrative remedies prior to filing suit so long as such remedies were actually available. *Ross v. Blake*, 136 S. Ct. 1850, 1856, 1858–60 (2016).

## IV.    ANALYSIS

Defendant argues summary judgment is appropriate for multiple reasons: (1) plaintiff failed to exhaust administrative remedies at the penitentiary as required prior to bringing suit; (2) plaintiff failed to show defendants were deliberately indifferent to plaintiff's medical needs; (3) plaintiff's claims for monetary relief are barred by Title 42, United States Code, Section 1997e(e); (4) plaintiff's claims against defendant Barner must be dismissed because there is no constitutional right to have a grievance resolved in plaintiff's favor; (5) defendant's Karberg, Barner and Krugle are entitled to judgment as a matter of law because they were not involved in plaintiff's care at issue; (6) defendant Karberg cannot be liable based on respondeat superior principles; and, alternatively (7) defendants are entitled to qualified immunity. (Doc. 73-1). Plaintiff resists, except to state that he "voluntarily dismisses his claims against Defendant Karberg." (Doc. 81, at 2). The Court will address each ground in turn, except as to defendant Karberg, given plaintiff's concession that Karberg should be dismissed as a defendant.

### A.    Failure to Exhaust Administrative Remedies

Defendants argue that plaintiff did not exhaust his administrative remedies at the penitentiary as required under the PLRA and so is barred from bringing a claim under Section 1983. (Doc. 73-1, at 4-7); *see* 42 U.S.C. § 1997e(a). Defendants assert that plaintiff did not fully and properly exhaust his administrative remedies prior to filing suit on October 15, 2021. (*Id.*, at 6). Defendants acknowledge that plaintiff filed four grievances prior to filing the lawsuit, but argue that they were defective for various reasons. (*Id.*). Grievance 48092 was improper because he did not first attempt informal

Case 1:21-cv-00098-CJW-KEM   Document 90   Filed 04/21/23   Page 17 of 29

resolution before filing it. (*Id.*). Grievance 48362 was improper because it addressed a matter with Dubuque County and not the penitentiary. (*Id.*). Grievance 49888 raised medical concerns, but nothing to do with plaintiff's right shoulder. (*Id.*, at 6-7). Grievance 51727 was not fully exhausted until November 29, 2021, after plaintiff filed suit. (*Id.*, at 7).

In his resistance to the motion to dismiss, plaintiff addresses only Grievance 49888, and insists that it did address plaintiff's right shoulder. (Doc. 81, at 10-11).

In the "Description of Problem" portion of Grievance 49888, plaintiff wrote:

4-14-21 I [messaged] (NSD) Laura Barner about my on going pain in R-shoulder + L-shoulder + multipl[e] points in my back along with both hips and left knee[.] [M]ed staff has only addressed R-shoulder issue and nothing els[e.] I have not got a response[e] back from (NSD) and I'm in pain every day.

(Doc. 73-3, at 38). In his appeal of the denial of the grievance, plaintiff went on to emphasize that, although he was aware there was an upcoming appointment at the University of Iowa to address his right shoulder pain, that "does nothing for L-shoulder + neck + #3 points in my back + both hips and L knee." (*Id.*, at 44). Plaintiff argues that surgery on his right shoulder "does nothing to the other problem areas." (*Id.*, at 45). Plaintiff went on to recite his need for pain medications to address his "chronic pain" arising from "damage[d] disk and joints." (*Id.*, at 46).

Plaintiff argues that because Grievance 49888 mentions his right shoulder, "the Grievance obviously still concerns the ongoing pain he was feeling in that same shoulder." (Doc. 81, at 11). The Court finds that it is not obvious that Grievance 49888 addressed medical treatment plaintiff was receiving for his right shoulder, the subject of his lawsuit. To the contrary, a plain reading of plaintiff's grievance, as further informed by his elaboration on appeal from denial of his grievance, is that plaintiff was complaining

18

that the penitentiary was failing to address all his other medical problems and that their efforts to address his right shoulder pain would not address these other issues.

Plaintiff does not dispute that Grievances 48092, 48362 and 51727 were not fully and properly exhausted prior to filing suit, and the Court finds Grievance 49888 did not raise a complaint about medical treatment of plaintiff's right shoulder. Thus, the Court finds plaintiff has failed to exhaust his administrative remedies and on that ground alone summary judgment is proper.

### B. Deliberate Indifference to a Serious Medical Need

Defendants argue they were not deliberately indifferent to plaintiff's right shoulder injury and therefore are entitled to summary judgment. (Doc. 73-1, at 7-12). Defendants argue that after plaintiff was transferred to the penitentiary, they evaluated his shoulder and referred him to the UIHC orthopedic clinic, and while plaintiff was awaiting that appointment and the follow up surgery, the penitentiary staff continued to monitor his shoulder complaints and provided him pain medication, physical therapy, and work restrictions. (Id., at 7-8). Though defendants acknowledge a delay between June 2020 when plaintiff was referred to the UIHC clinic and his appointment, defendants point out that the delay was due to COVID-19 pandemic restrictions and problems. (Id., at 7).

Plaintiff argues he has presented evidence showing that defendants "ignored an objectively serious medical need and delayed his diagnosis and treatment to the point that he suffered significantly worse pain than the injury would otherwise cause." (Doc. 81, at 10). Plaintiff relies on his expert's opinion that plaintiff presented "with symptoms consistent with a labral tear as early as December 2019," and that defendants "wrote the injury off as mere shoulder pain" prescribing over the counter pain relievers and range of motion exercises. (Id., at 14). As for the subjective part of a deliberate indifference claim, plaintiff argues that Dr. Dehner demonstrated deliberate indifference by failing to evaluate and provide appropriate treatment for plaintiff's shoulder pain, persisting with

19

conservative treatment. (*Id.*, at 15). Plaintiff argues that Dr. Dehner's ordering of an X-ray, even though he knew that a rotator cuff injury could only be diagnosed with an MRI, is further evidence of his subjectively deliberate indifference. (*Id.*, at 15-16). Plaintiff addresses the subjective intent as to all the other defendants by referencing a single nursing staff entry that encouraged plaintiff to walk around when informed of the pain he was suffering. (*Id.*, at 16). Last, plaintiff argues that "their delays and unresponsiveness in the face of [plaintiff's] continued complaints contributed to his injury." (*Id.*). Again, plaintiff relies on his expert's opinion that "significant adverse health effects could be a consequence from a delay in diagnosis and treatment, including chronic or recurrent shoulder instability, pain, and weakness." (*Id.*). Plaintiff acknowledges that the surgery was effective in treating his shoulder, but "[h]e could have been saved a significant amount of pain by prompt attention to the injury." (*Id.*).

As for the objective prong of the deliberate indifference claim, defendants do not contest that plaintiff's rotator cuff injury constitutes an objectively serious medical need. The undisputed material facts, however, show that plaintiff cannot prove the subjective prong.

As to the subjective prong, as noted a plaintiff must show "a mental state akin to criminal recklessness." *Jackson,* 756 F.3d at 1065 (citation and internal quotation marks omitted). Indeed, a defendant's action must be "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." *Id.* at 1066 (citation omitted). Here, defendants did not refuse to provide essential care. Plaintiff submitted multiple requests for medical care in reference to his shoulder during his incarceration at the penitentiary. The penitentiary medical staff was responsive. Contrary to plaintiff's assertion, defendants did not ignore his shoulder injury. Defendants never wrote plaintiff's complaint's off as a mere shoulder pain; to the contrary, from the beginning

of their evaluation of plaintiff the staff considered the possibility that plaintiff's shoulder injury was more serious and needed further evaluation.

As for Dr. Dehner specifically, the record shows that he properly evaluated plaintiff and undertook a course of evaluation and treatment to address plaintiff's right shoulder. That Dr. Dehner first ordered an x-ray as part of the evaluation does not show deliberate indifference. An x-ray is an obvious and arguably necessary first step in assessing a medical problem. True, a labral tear cannot be detected through an x-ray. But the absence of a visible injury revealed by an x-ray assists in diagnosing the problem as a labral tear. Dr. Dehner referred plaintiff for an orthopedic examination at the UIHC within a reasonable time of his evaluation of plaintiff's shoulder where a firm diagnosis could be made with an MRI or CAT scan, procedures not available at the penitentiary. (Doc. 83, at 47). Even if the treatment provided by Dr. Dehner was inadequate or even negligent, plaintiff has provided no indication that Dr. Dehner was deliberately indifferent to plaintiff's medical needs.

Plaintiff made no attempt to identify facts showing that any of the other defendants were subjectively deliberately indifferent to plaintiff's complaints about his shoulder. It is not enough for plaintiff to make a sweeping claim that the delays in treatment and unresponsiveness shows deliberate indifference. A plaintiff must come forward with evidence as to each defendant to show that particular defendant was subjectively deliberately indifferent to plaintiff's medical needs about his right shoulder. Plaintiff has failed to do so. Nor is it the Court's responsibility to comb the record to find facts to support plaintiff. "'Judges are not like pigs, hunting for truffles buried in briefs' or the record." *ASARCO, LLC v. Union Pac. R. Co.*, 762 F.3d 744, 753 (8th Cir. 2014) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam)). In any event, the Court's review of the record failed to alert it to any instance when a member of the penitentiary medical staff was deliberately indifferent to plaintiff's

complaint about shoulder pain. When he complained, they responded. When he asked for appointments, he was seen. The staff evaluated and monitored his condition, treated his pain with medication, provided him therapy, and restricted his work. Plaintiff and his expert may, with the benefit of hindsight, suggest that the medical staff should have diagnosed his rotator cuff injury sooner and should have pursued a different course of treatment. Plaintiff and his expert may even assert that defendants were negligent in his care. But what plaintiff cannot show on this record is deliberate indifference to his serious medical needs.

Plaintiff's only reference to a defendant other than Dr. Dehner is to Sally Potter, a penitentiary nurse, who plaintiff alleged "encourage[d] him to walk around" as her only way to address his shoulder pain. (Doc. 81, at 16 (citing Potter Deposition at 12-15, Doc. 83, at 24)). That reference is misleading, though, because nurse Potter was addressing plaintiff's back pain. The full testimony was: "I did encourage him to walk around. You know, sitting and lying around is not good for his back pain." (Doc. 83, at 24). In the preceding pages, nurse Potter testified about plaintiff's shoulder pain. There, she testified she assessed his complaint and found he had full range of motion in his shoulder, but with pain, and referred him to see the doctor, explaining she could not change his medication without a doctor's order. (*Id.*, at 23-24). In context, then, plaintiff's reference to nurse Potter's treatment of him only further shows a lack of deliberate indifference to his serious medical needs.

There is, in the record, arguably two periods of delay in treatment. The first occurred between the time Dr. Dehner evaluated plaintiff and determined an orthopedic referral was necessary (June 11, 2020) and the making of that referral (June 19, 2020), a period of eight days. The second occurred between the making of that referral and plaintiff's orthopedic appointment at the UIHC on December 31, 2020. During that later time period, plaintiff was diagnosed with COVID-19 and there were more than 800

documented cases of COVID-19 at the penitentiary. Transportation for outpatient specialty appointments was limited as many of the UIHC's referral services were unable to accommodate non-urgent and non-emergent referrals out of an effort to limit the spread of the virus.

"It is well settled that an intentional delay in obtaining medical care for a prisoner who needs it may be a violation of the eighth amendment." *Ruark v. Drury*, 21 F.3d 213, 216 (8th Cir. 1994). However, "[t]he Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish." *Jenkins*, 557 F.3d at 633. "The Eighth Circuit Court of Appeals has been more likely to find delay constituted deliberate indifference for life-threatening ailments." *Celia v. N. Cent. Corr. Facility*, No. C13-3003-MWB, 2014 WL 2628676, at *7–8 (N.D. Iowa June 13, 2014), *report and recommendation adopted,* No. C13-3003-MWB, 2014 WL 4961450 (N.D. Iowa Oct. 3, 2014). It also considers relevant the length of delay and severity of the condition. *Id.* Moreover, "[w]hen an inmate alleges that a delay in medical treatment constituted a constitutional deprivation, 'the objective seriousness of the deprivation should also be measured by reference to the effect of delay in treatment.'" *Coleman*, 114 F.3d at 784 (quoting *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997)).

Here, though, the first delay was negligible in length of time, given the non-emergent nature of plaintiff's shoulder pain. Further, plaintiff has not shown the delay was intentional. Nor can plaintiff show that the delay caused any additional injury or pain and suffering because, due to the COVID-19 pandemic, the UIHC was unable to accommodate the request for an orthopedic appointment before the end of December in any event.

As previously noted, negligence in diagnosing or treating a medical condition does not constitute a claim of deliberate indifference. *Estelle*, 429 U.S. at 105-06. Rather, the "prisoner must show more than negligence, more even than gross negligence, and

23

mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995); *see also Jones v. Norris*, 310 F.3d 610, 612 (8th Cir. 2002) ("At best, [the plaintiff's] allegations state a difference in opinion between himself and his doctors or allege a mistake in classification or treatment. Neither differences of opinion nor medical malpractice state an actionable Constitutional violation."). The defendant provider may have been negligent in his treatment of plaintiff's shoulder and may have misdiagnosed a torn rotator cuff. However, such negligence in diagnosing or treating a medical condition is an insufficient basis for the subjective prong. *Estelle*, 429 U.S. at 104-07. An incorrect diagnosis does not constitute deliberate indifference, nor does medical malpractice. *Jolly v. Knudsen*, 205 F.3d 1094, 1097 (8th Cir. 2000) (citations omitted); *Bellecourt*, 994 F.2d at 431. In addition, as noted in *Estelle v. Gamble*, a medical decision to forego an x-ray or other diagnostic test without more does not rise to the level of an Eighth Amendment violation. *Estelle*, 429 U.S. at 107. Thus, the acts and omissions by defendants amount to no more than negligence, if even that. Plaintiff fails to adequately provide evidence establishing the subjective prong—that defendants were deliberately indifferent to and disregarded an excessive risk to plaintiff's health.

Given this undisputed evidence, even viewed in the light most favorable to plaintiff, the Court finds that a reasonable jury could not conclude that defendants were deliberately indifferent to plaintiff's serious medical needs. Thus, defendants are entitled to summary judgment on this ground.

### C. Claims for Monetary Relief Under 42 U.S.C. 1997e(e)

Defendants argue that plaintiff's claims for monetary damages are barred by Title 42, United States Code, Section 1997e(e), which provides:

> No Federal civil action may be brought by a prisoner confined in a jail, prison or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury . . .

Defendants read this provision as requiring proof that the prisoner had to suffer the physical injury while in the correctional facility. (Doc. 73-1, at 12). Because plaintiff suffered the physical injury to his shoulder before he came into custody of the penitentiary, defendants reason that he is barred from seeking monetary damages from them. (*Id.*). Defendants do not cite any case supporting this interpretation of the statute.

Defendants are simply wrong. Nothing in the plain language of the statute requires proof that the physical injury be suffered while in custody. If that had been Congress's intent, it could have simply said so by adding those words at the end of the sentence. And binding Eighth Circuit authority dispenses of defendants' argument. *See McAdoo v. Martin*, 899 F.3d 521, 526 (8th Cir. 2018) (holding that the "PLRA requires a showing of harm caused by some unconstitutional conduct that amounted to deliberate indifference and an accompanying showing of physical injury. The PLRA does not say whether the unconstitutional conduct must cause the physical injury").

Thus, the Court denies defendants' motion for summary judgment on this ground.

### D.     *Claims Against Defendant Barner and Krugle*

Defendants argue that plaintiff's claims against defendant Barner must be dismissed because plaintiff does not have a constitutional right to have a grievance resolved in his favor. (Doc. 73-1, at 13). Defendants argue that defendant Barner's only involvement with plaintiff had to do with his grievance procedure. (*Id.*). Defendants also argue they are entitled to judgment as a matter of law as to plaintiff's claims against Barner and Krugle because they were not involved in the medical decisions of which plaintiff complains. (*Id.*, at 13-14). Plaintiff does not specifically address Barner's involvement in the grievance process, but asserts that Barner and Krugle are proper defendants because they "were involved in medical decision[s] regarding [plaintiff's] care, albeit after his shoulder surgery." (Doc. 81, at 18). Plaintiff asserts that his

"complaint relates to the totality of the medical care he receive at Anamosa," going on to reference Grievances 49888 and 51727. (*Id.*). Plaintiff asserts that "[f]actual disputes still remain regarding the adequacy of care provided" to him "throughout the entire chronology of his treatment." (*Id.*).

The problem here, though, is plaintiff fails to identify what those facts are that are in dispute which, if taken in plaintiff's favor, would show that defendants Barner and Krugle were deliberately indifferent to his serious medical needs. Plaintiff's reference to the grievances are of no help because both address medical issues other than plaintiff's right shoulder. Summary judgment is the time to come forward with evidence showing a genuine issue of material fact. *See Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (summary judgment is the "put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events"). It is not sufficient for plaintiff to simply allege there are factual disputes; he must show them to the Court. He has not done so here. He has not said what it was that defendant Barner or defendant Krugle did that show they were deliberately indifferent to a medical need as it relates to his right shoulder. It is telling that in his statement of additional material facts, plaintiff does not cite to a single event that occurred after his surgery. (Doc. 81-1). And given that the only time they were involved with his medical care came after the surgery, which plaintiff conceded effectively treated his shoulder, it is hard to imagine what they possibly could have done after that.

### E.    *Qualified Immunity*

Defendants argue they are entitled to qualified immunity because their conduct was objectively reasonable in light of the legal rules that were clearly established at the time. (Doc. 73-1, at 15-16). Plaintiff disagrees. (Doc. 81, at 19). Both parties simply reiterate their positions about whether defendants were deliberately indifferent to

plaintiff's medical needs, which does not contribute much to a qualified immunity analysis. Because defendants raised qualified immunity at the summary judgment stage, plaintiff must produce evidence to create a genuine issue of fact regarding whether defendants violated "clearly established" law. *Johnson v. Fankell*, 520 U.S. 911, 915 (1997). Plaintiff has not done so here. To show this, plaintiff must identify "either controlling authority or a robust consensus of cases of persuasive authority that placed the statutory or constitutional question beyond debate at the time of the alleged violation." *Kelsay v. Ernst*, 933 F.3d 975, 979 (8th Cir. 2019) (en banc) (internal quotation marks and citation omitted).

"The defense of qualified immunity gives government officials engaged in discretionary activities immunity from liability unless their conduct violates clearly established statutory or constitutional rights." *Gorman v. Bartch*, 152 F.3d 907, 914 (8th Cir. 1998) (internal quotation marks and citation omitted). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It protects government officials from "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (citation omitted).

Put another way, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (internal quotations and citation omitted). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004) (citation omitted). The Court uses a two-part test to determine whether a government official is entitled to qualified immunity. *See Branch v. Gorman*, 742 F.3d 1069, 1072 (8th Cir. 2014). The Court must decide (1) whether the facts when viewed

in a light most favorable to the plaintiff demonstrate the defendant deprived plaintiff of a constitutional or statutory right, and (2) whether the right was clearly established at the time of the deprivation. *Id.* "If the answer to either question is no, then [a defendant] is entitled to qualified immunity." *Doe v. Flaherty*, 623 F.3d 577, 583 (8th Cir. 2010). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of preexisting law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal citation omitted). In other words, "there does not have to be a previous case with exactly the same factual issues." *Nance v. Sammis*, 586 F.3d 604, 611 (8th Cir. 2009) (citation omitted). But the implicated right cannot be defined "at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

Here, the Court found there was no genuine issue of material fact that would permit a reasonable jury to find that defendants were deliberately indifferent to plaintiff's serious medical needs. There is no clearly established law that would, on this record, have made defendants aware that they were violating plaintiff's constitutional rights in the way they provided him medical care for his right shoulder. Accordingly, even if the Court were to have found that defendants violated plaintiff's constitutional rights, the Court would alternatively grant defendants qualified immunity because the law did not clearly establish that their conduct was unconstitutional.

Thus, the Court grants defendants' motion for summary judgment on this ground.

## V.    CONCLUSION

For these reasons, the Court **grants** defendants' motion for summary judgment. (Doc. 73).  The Clerk of Court is directed to **enter judgment** in favor of defendants and against plaintiff.  This case is **dismissed with prejudice**.

**IT IS SO ORDERED** this 21st day of April, 2023.

_____
C.J. Williams
United States District Judge
Northern District of Iowa